IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

KENTIN WAITS,                          )
                                       )
            Plaintiff,                 )
                                       )        01 C 4010
            v.                         )
                                       )        Judge Hibbler
CITY OF CHICAGO, CALLIE L. BAIRD, and  )
UNKNOWN CHICAGO POLICE OFFICERS,       )
                                       )
            Defendants.                )

**DOCKETED** FEB 0 5 2003

### NOTICE OF FILING

**FILED** FEB - 4 2003 rq

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

TO:
        Mike Monahan
        Kim Brown
        Asst. Corp. Counsel
        30 N. LaSalle St.
        Chicago, IL 60602

        Please take notice that on February 4, 2003 I filed the
attached RESPONSE at the United States Courthouse, 219 South
Dearborn in Chicago, IL.

                                    _____
                                    Attorney for Plaintiff

Jon Loevy
LOEVY & LOEVY
434 West Ontario, Suite 400
Chicago, IL 60610

### CERTIFICATE OF SERVICE

        I, Jon Loevy, certify that on February 3, 2003, I
delivered the above-referenced documents to the above-named
counsel of record.

                                    _____

# FILED

FEB - 4 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

KENTIN WAITS, )
)
          Plaintiff, )
)    01 C 4010
          v. )
)    Judge Hibbler
CITY OF CHICAGO, MICHAEL PRUSANK, )
and DANIEL DURST, )
)
          Defendants. )

DOCKETED
FEB 0 5 2003

## PLAINTIFF'S REPLY IN SUPPORT OF ENTRY OF JUDGMENT AND IN RESPONSE TO DEFENDANTS' OBJECTIONS

Arthur Loevy
Jon Loevy
Michael Kanovitz
Danielle Loevy
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900



## Introduction

As the Court itself explained to the eight members of our community who agreed to sacrifice more than a week of their time to serve as jurors for this case, the jury system is a very important part of our constitutional system. In our democratic nation, civil juries are explicitly entrusted with the responsibility to impose their sense of justice via monetary judgments, judgments which a court may reduce only enough to ensure they are not "monstrously excessive."

After hearing a week of testimony and then deliberating for several days, the jury opted to credit Plaintiff's version of the events and reject that of Defendants. This conclusion (which was unequivocal) was undeniably the jury's prerogative. Moreover, Defendants' argument that the award should be reduced ignores ample caselaw supporting punitive damage awards of this magnitude; to the extent there is any room for a remittitur, the downward departure from the jury's verdict, if any, should be limited in light of this law.

Finally, there is no merit to Defendants' suggestion that the Court erred in permitting Plaintiff to make certain arguments which Defendants now claim "inflamed" the jury. There simply can be no dispute that the Court gave the Defendants every opportunity to present their case to the fullest extent. Nothing about Defendants' present complaints (the majority of which are being presented to the Court for the first time, long after the conclusion of the trial, and are thus waived) changes the reality that this trial was more than fair to Defendants.

## I.     THE EVIDENCE PRESENTED AT TRIAL

### A.     DEFENDANTS' VERSION

Defendants' presentation of the facts suffers from a fatal defect: they ask this Court to see the evidence in a light most favorable to themselves, whereas it is Plaintiff who is entitled to every benefit of the doubt at this stage. Research Systems Corp. v.

IPSOS Publicite, 276 F.3d 914, 921 (7th Cir. 2002) ("this court will not re-weigh the evidence; rather, we must view the evidence in the light most favorable to the prevailing party [] and draw all reasonable inferences in its favor"). Defendants' factual presentation, which reads just like their counsel's unsuccessful closing argument, relies improperly on factual inferences which have already been soundly rejected by the jury.

**B.    THE VERSION OF THE FACTS ACCEPTED BY THE JURY**

On July 22, 2000, Plaintiff Kentin Waits made a mistake. He sprayed a Chicago Police Officer with his water bottle, an act which eventually resulted in a guilty plea to the charge of misdemeanor battery.

The following morning, Plaintiff was arrested by, among others, Defendants Durst and Prusank. During the transport to the police station, Durst made threatening gestures and comments to Plaintiff. As Plaintiff was being led into the station, the support staff stood and applauded his capture.

Plaintiff was then locked in a small interrogation room with a single window on the back of the door which, disturbingly, had paper taped over it to prevent people from seeing what was happening inside the room. Both of Plaintiff's hands were cuffed behind his back and then shackled to a metal bar about waist level. The Defendants entered the room, closed the door, and began berating Plaintiff for spraying Officer Kostecki. Plaintiff apologized for spraying the officer and offered to apologize directly to Kostecki.

Thereafter, Durst began hitting Plaintiff's face/head/neck area approximately fifteen times with an open hand; the slaps were hard and painful. Although his hands were shackled behind him, Plaintiff did his best to avoid the blows. At the conclusion of this beating, Durst kneed Plaintiff in the groin causing additional pain

2

and then tried to goad Plaintiff into "fighting back." Prusank, who was Durst's superior officer, stood by and failed to intervene to prevent this beating despite every opportunity to have done so.

After about an hour in the room, Defendants took Plaintiff to be processed. Plaintiff debated telling other officers about the beating, but decided it was in his best interest to keep quiet, especially given Durst's warning that police officers in that District "stick together" and that if "he messed with one of them, he messed with all of them." Durst also threatened Plaintiff that he was going to experience sexual violence in his cell, a threat which fortunately did not materialize, but nonetheless caused Plaintiff considerable distress over the next twenty-plus hours of his incarceration.

By the time he was finally released the following morning, Plaintiff was extremely upset. His friends Dale Nehls and Krista Knigge corroborated his distress, as well as the continuing symptoms he suffered in the weeks and months that followed. Both Nehls and Knigge, as well as Plaintiff plus his therapist, Dr. Linden, all testified that these included mild depression, decreased enjoyment of life activities, appetite changes, decreased ability to concentrate at work, and continuing fear of more reprisals. Plaintiff's expert rebuttal witness added that while all of this may not risen the level of full-blown Post-Traumatic Stress Disorder, Plaintiff certainly suffered in a material way.

## C. THE DEFENDANTS DID NOT TESTIFY TRUTHFULLY

The Defendants claimed this was a normal arrest, treated no differently than it would have been if the victim of Plaintiff's crime had not been a police officer from their district. Defendants' testimony in that regard, however, unravelled so badly at trial that the jury was entitled to conclude, as it did, that Defendants had testified falsely on a number of points.

3

For example, of all of the hundreds of potential criminals to arrest that morning, Prusank opted to send almost half of his tactical team all the way across the North side of the City to Plaintiff's house straight from roll call. Defendants' explanation -- that they had no leads or clues on any of the other potential criminals except Plaintiff -- was inherently unbelievable. Defendants further dissembled when they testified that it was relatively routine to leave their district to make an arrest. On the contrary, Lt. Kuehn testified Prusank needed special permission to leave the district and Officer Broderick admitted that in his six year career, it has happened only five to ten times. Kostecki later added that the Defendants did not even wait for him to sign a complaint, which he testified was necessary to make the arrest.

By its verdict, the jury signalled its belief that the Defendants were not telling the truth about any of these points, not to mention the jury's fundamental conclusion that they had lied about the beating itself. See Ibaenez v. Velasco, 2002 WL 731778, *13 n.8 (N.D.Ill. April 25, 2002) (where defendants maintained innocence throughout an excessive force case, "[t]he jury found that it was the defendants who had lied. The jurors had to conclude that the defendants were utterly without remorse for their outrageous misconduct and the injuries they had caused. This is a factor that weighs heavily in support of a large punitive damages award").

II.     **THERE IS NO JUSTIFICATION FOR A REMITTITUR OF THE JURY'S PUNITIVE DAMAGE AWARD OR, ALTERNATIVELY, ANY REDUCTION OF THE AWARD SHOULD BE MINIMAL**

        A.      **JURIES HAVE CONSIDERABLE DISCRETION IN SETTING DAMAGES, AND COURTS WILL DISTURB JURY DETERMINATIONS ONLY WHERE AN AWARD IS "MONSTROUSLY EXCESSIVE"**

It is well-settled that a jury "has wide discretion in determining damages," and the Seventh Circuit has repeatedly held that a trial judge may disturb a jury's verdict only when the award was

4

"monstrously excessive" or the award has "no rational connection to the evidence." Liu v. Price Waterhouse LLP, 302 F.3d 749 (7th Cir. 2002) (citations omitted); Holmes v. Elgin, Joliet & Eastern RR. Co., 18 F.3d 1393, 1395 (7th Cir. 1994). See also American Nat. Bank & Trust Co. v. Regional Transp. Authority, 125 F.3d 420, 437 (7th Cir. 1997) ("Because damage calculations are essentially an exercise in factfinding, our review of the jury's damage award is deferential").

Applying this highly deferential standard to this case, Defendants are incorrect in arguing that the jury's verdict runs afoul of the due process clause under the Supreme Court's most recent pronouncement on the issue, BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) (hereafter "BMW"). In fact, all three of the relevant "guideposts" laid down by the Supreme Court in BMW directly support Plaintiff's punitive damage award in this case. 517 U.S. at 574-75.

**B. ALL THREE BMW FACTORS FAVOR UPHOLDING THE SUBSTANTIAL PUNITIVE DAMAGE AWARDED HERE**

In BMW, the Supreme Court outlined three relevant factors for assessing the propriety of punitive damage awards, none of which warrant disturbing the jury's verdict in this case. In the alternative, if the Court does decide to reduce the jury's award, no reduction to any amount less than $75,000 per officer could survive appellate review in light of application of the BMW factors. See Marek v. Stepkowski, 608 N.E.2d 285, 291, 241 Ill. App. 3d 862, 871 (1 Dist. 1992) ("The amount of punitive damages is in the sound discretion of the trier of fact"); Ismail v. Cohen, 899 F.2d 183, 185-87 (2d Cir. 1990) ("It is well settled that calculation of damages is the province of the jury").

**1. DEGREE OF REPREHENSIBILITY/PRESENCE OF VIOLENCE**

According to the Supreme Court, "perhaps the most important indicium of the reasonableness of a punitive damages award is the

degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575. Moreover, "[i]n determining the reprehensibility of a defendant's wrongful conduct, an important factor is whether violence has occurred." Id. at 576. See also Marshall ex rel. Gossens v. Teske, 284 F.3d 765, 772-73 (7th Cir. 2002) (punitive damages are appropriate "in a Section 1983 case if [a jury] finds that the defendants' conduct was motivated by evil intent or callous indifference to the plaintiff's federally protected rights").

Viewing the evidence in the light most favorable to Plaintiff, the jury determined here that while Prusank looked on without intervening, Durst hit Plaintiff repeatedly in the face and head while his hands were shackled behind his back, culminating in a knee to the groin and an attempt to goad Plaintiff into a fight. Unprovoked violence of this nature by a police officer against a man whose hands are shackled could not be any more reprehensible. Cooper v. Casey, 97 F.3d 914, 919 (7th Cir. 1996) ("We cannot think of a better case for an award of punitive damages" than a "wanton and cowardly attack" on prisoners who are shackled); Grimm v. Lane, 895 F.Supp. 907, 916-17 (S.D.Ohio 1995) (affirming more than $150,000 in punitive damages for unprovoked beating while victim was handcuffed); O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988) ($185,000 in punitive awards were not excessive where plaintiff was hit about the face while handcuffed as another officer watched, even absent permanent physical or emotional injury).[1]

Perhaps even more significant, however, is the fact that Defendants are police officers, entrusted with the power to use arrest

---

[1]  Moreover, the fact that Defendants had deliberately covered the window to conceal their misdeeds is further evidence of evil intent. BMW, 116 S.Ct. at 1599-1600 (conduct is more reprehensible, and thus deserving of greater punishment, if the defendant knew or suspected that it was unlawful).

and detain people because they are sworn to uphold the law. Zarcone v. Perry, 572 F.2d , 56-57 (2d Cir. 1978) ("the abuse of official power here was intolerable, and when a jury has dealt with it severely, as it should, we will not draw fine lines to restrain its dispensation of justice"); Johnson v. Howard, 24 Fed. Appx. 480, 485-87, 2001 WL 1609897, *3-*4 (6th Cir. Dec. 12, 2001) (higher degree of reprehensibility where violence was "administered by someone in a position of authority"). Far from, say, an employment dispute or a product liability case, this is the sort of conduct for which punitive damages are especially apropos. O'Neill v. Krzeminski, 839 F.2d 9, 13 (2d Cir. 1988) ("A punitive award 'may be an integral part of the remedy in a civil rights action'"); Carey v. Piphus, 435 U.S. 247, 257 n.11 (1978) (punitive damages may be awarded under Section 1983 to deter or punish constitutional violations).[2]

## 2. RATIO TO ACTUAL HARM INFLICTED

In BMW, the Supreme Court held that $2 million in punitive damages was excessive in light of the low level of reprehensibility of defendant's conduct (not advising dealers of pre-delivery damage to new cars when the cost of repair was less than 3% of cars' suggested retail price) coupled with the 500:1 ratio of punitive damages to the $4,000 in compensatory damages. BMW, 517 U.S. at 574-75. The other Supreme Court case cited by Defendants, however, **affirmed** a $10

---

[2] Other far less reprehensible conduct in other contexts, for example, has been deemed sufficient to support substantial awards. Compare, e.g., Ciampi v. Ogden Chrysler Plymouth, Inc., 262 Ill. App. 3d 94, 634 N.E.2d 448 (2 Dist. 1994) ("As to the nature and enormity of the wrong, Ogden's statements were clearly intended to induce Ciampi to purchase the LeBaron at a price considerably more than the car's worth. Ciampi paid even more for the LeBaron than the manufacturer's suggested retail price for the vehicle without 13,000 miles of usage. We conclude that the award of $100,000 is both appropriate and proportionate to the nature and the enormity of the wrong"); Howard v. Zack Co., 264 Ill. App. 3d 1012, 1028, 637 N.E.2d 1183, 1194 (1 Dist. 1994) ($300,000 in punitive damages for retaliatory discharge despite only $27,960 compensatory damages).

million punitive damage award despite only $19,000 in actual damages, a 526:1 ratio. TXO Prod'n Corp. v. Alliance Resources Corp., 509 U.S. 443, 452-62 (1993) ("we do not consider the dramatic disparity between the actual damages and the punitive award controlling in a case of this character"). There is thus nothing inherently wrong with ratios of this nature which automatically suggests passion or prejudice. Id.

Compared to the 500:1 ratio of punitive to compensatory damages rejected in BMW, and the 526:1 ratio affirmed in TXO, the ratios here are 33:1 for Durst and 100:1 for Prusank. Defendants' present argument that these ratios are so out of line that their constitutional due process rights would be violated finds no support in BMW, TXO, or any of the cases interpreting them.

Specifically, the Supreme Court "has never held that simple mathematical ratios are the be-all and end-all in punitive damages analysis, and nothing in [BMW] would support such a rule." Shea v. Galaxie Lumber & Const. Co., Ltd., 152 F.3d 729, 736 (7th Cir. 1998) (upholding $2,500 punitive damage award which was 2,500 times greater than the $1 of actual damages awarded); Cooper v. Casey, 97 F.3d 914, 919 (7th Cir. 1996) ("While the limits that courts place on the size of awards of punitive damages probably should be more definite and predictable than under current law, a mechanical ratio. . . would not make good sense") (citing BMW). As BMW itself made clear, the Court has actually "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. . . . Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." BMW, 517 U.S. at 582-83 ("In most cases, the ratio

will be within a constitutionally acceptable range, and remittitur will not be justified on this basis").

        Looking to application of the BMW principles in other cases, the 33:1 and 100:1 ratios which the jury returned here are no grounds for concern. See, e.g., Blackledge v. Carlone, 126 F.Supp. 2d 224, 229 (D.Conn. 2001) ("The court finds that the 40-to-1 ratio here [in an excessive force case] does not approach the 'breathtaking 500 to 1' ratio which the [BMW] Court concluded must surely 'raise a suspicious judicial eyebrow'" and "comports with the reprehensibility of Carlone's actions" in using violence against handcuffed/helpless individual); Swick v. Liautaud, 169 Ill. 2d 504, 662 N.E.2d 1238 (Ill. 1996) (affirming $400,000 in punitive damages against an individual despite only $5,000 in damages --an 80:1 ratio-- for malicious prosecution, interference with prospective advantage, and intentional infliction of emotional distress); Weaver v. African Methodist Episcopal Church, Inc., 54 S.W.3d 575, 589-90 (Mo. App. 2001) (applying BMW and affirming $1 million punitive damages against an individual person despite only $15,000 in actual damages for a 66:1 ratio, for grabbing a woman's breast in the context of a history of verbal and physical sexual harassment"); Cooper v. Casey, 97 F.3d 914, 919 (7th Cir. 1996) (total of $130,000 in punitive damages in beating by prison guard where compensatory damages were only $5,000).

        Moreover, the fact that BMW Court "found the 500 to 1 ratio in that contract dispute to be 'breathtaking'. . .does not necessarily control the fair ratios in a § 1983 case. . . [t]he Supreme Court's observations in [BMW] reinforce that view: violations of civil rights may very well be 'particularly egregious' acts that result in only 'a small amount of economic damages' or injuries whose monetary value is 'difficult to determine.'" Lee v. Edwards, 101 F.3d 805, 809-11 (2d Cir. 1996). Thus, in a case such as this one where the injury

9

suffered by Plaintiff was relatively impermanent and the emotional distress dissipated with time, punitive damages play an especially important function because important constitutional principles are at stake. Nydam v. Lennerton, 948 F.2d 808, 811 (1st Cir. 1991) ("A punitive award 'may be an integral part of the remedy in a civil rights action'"), citing Smith v. Wade, 461 U.S. 30, 56 (1983). As the Seventh Circuit has explained:

> The smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages. The compensatory damages were low here in part because of the inherent difficulties of fixing a dollar equivalent for subjective injuries, such as fright and pain. An award of punitive damages proportioned to the low compensatory damages that were awarded would have a very meager deterrent effect, would fail to signal to the prison authorities that savage treatment of prisoners will not be tolerated, and would not be commensurate with the moral gravity of the Defendants' actions.

Cooper v. Casey, 97 F.3d 914, 919 (7th Cir. 1996); see also Ford v. Herman, 316 Ill. App. 3d 726, 733-34, 737 N.E.2d 332, 339 (5 Dist. 2000) ("we have previously held that the amount of punitive damages awarded does not need to be proportional, especially when a proportional punitive damages award with a small compensatory damages award would" constitute insufficient deterrence to others). The Seventh Circuit added in Kemezy v. Peters:

> Compensatory damages do not always compensate fully. Because courts insist that an award of compensatory damages have an objective basis in evidence, such awards are likely to fall short in some cases, especially when the injury is of an elusive or intangible character. If you spit upon another person in anger, you inflict a real injury but one exceedingly difficult to quantify. If the court is confident that the injurious conduct had no redeeming social value, so that "overdeterring" such conduct by an "excessive" award of damages is not a concern, a generous award of punitive damages will assure full compensation without impeding socially valuable conduct. By the same token, punitive damages are necessary in such cases in order to make sure that tortious conduct is not underdeterred, as it might be if compensatory damages fell short of the actual injury inflicted by the tort.

79 F.3d 33, 34 (7th Cir. 1996). There is thus nothing "monstrously excessive" about the 33:1 and 100:1 ratios here which implicate due

process or otherwise suggest undue passion. Plaintiff's Seventh Amendment right to trial by jury must prevail.

### 3. SANCTIONS FOR COMPARABLE MISCONDUCT AND THE DETERRENCE FACTOR

Defendants surveyed the country looking for punitive damage awards less than this one. Such an argument, however, reflects a misunderstanding of the law: the inquiry is not simply to look for lower punitive damage awards, as the Court's "task is not to balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater." Ismail v. Cohen, 899 F.2d 183, 188 (2d Cir. 1990); Miksis v. Howard, 106 F.3d 754, 758 (7th Cir. 1997) ("defendants argue that the verdict in this case is out of line with verdicts in similar cases. They cite a number of cases in which lesser damages were granted. But these cases prove nothing except that some plaintiffs have received less money than Miksis; they do not show the current award to be 'monstrously excessive'").

Turning to an examination of the range of permissible punitive damage awards under circumstances comparable to those at bar, it is plain that this award falls comfortably within the top end of acceptable boundaries. Alternatively, as stated above, no reduction to less than $75,000 per Defendant could be sustained.

Ford v. Herman, 316 Ill. App. 3d 726, 735-36, 737 N.E.2d 332, 339 (5 Dist. 2000) (upholding $6,000,000 punitive damage award against drunk driver under Illinois law);

McHugh v. Olympia Entertainment, Inc., 37 Fed. Appx. 730, 738-40, 2002 WL 1065948 (6th Cir. May 28, 2002) (upholding $1,200,000 in punitive damages where plaintiff was beaten up by law enforcement officials);

Adelman v. Adelman, 191 Misc. 2d 281, 288, 741 N.Y.S.2d 841, 848 (N.Y. Sup. 2002) (applying BMW and affirming punitive damages award of $2,250,000 for shooting plaintiff despite no compensatory damage award);

11

<u>Garner v. Meoli</u>, 19 F.Supp. 2d 378, 391-92 (E.D.Pa. 1998) (upholding $500,000 and $250,000 punitive damage awards against police officers for excessive force and malicious prosecution; "the Court cannot say that the jury improperly awarded punitive damages, nor can the Court say that those damages 'shock its conscience'");

<u>Davis v. Rennie</u>, 264 F.3d 86, 115 (1st Cir. 2001) (remittitur to $250,000 in punitive damages against each of two prison guards for violent restraint on Section 1983 theory);

<u>Hughes v. Patrolmen's Benevolent Ass'n</u>, 850 F.2d 876, 880-81 (2d Cir. 1988) ($350,000 in Section 1983 punitive damages);

<u>Ismail v. Cohen</u>, 899 F.2d 183, 187 (2d Cir. 1990) (reinstating a jury award of $150,000 in punitive damages in § 1983 case against a police officer alleging battery, false arrest, malicious prosecution and abuse of process claims);

<u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 13 (2d Cir. 1988) ($185,000 in punitive awards were not excessive where plaintiff was hit about the face while handcuffed as another officer watched, even absent permanent physical or emotional injury).

As Judge Grady recently observed, "[f]rom our non-exhaustive review of various punitive damage awards in excessive force cases from many jurisdictions, all we can conclude is that there is a tremendous variation." <u>Ibaenez v. Velasco</u>, 2002 WL 731778, *13-*14 (N.D.Ill. Apr. 25, 2002). Against this range of permissible awards, courts apply the "maximum recovery rule," which directs that the amount should be based on the "highest amount of damages that the jury could properly have awarded based on the relevant evidence." <u>Jabat, Inc. v. Smith</u> 201 F.3d 852, 857 (7th Cir. 2000).

In this case, the jury's awards are within the "maximum recovery" rule. There are undoubtedly cases with smaller punitive damage awards, as well as cases with larger ones, but there is nothing about this third and final <u>BMW</u> factor which is any more availing to Defendants than the previous two. Application of the three-prong <u>BMW</u> test, therefore, strongly supports a conclusion that the Court should leave the jury's verdict intact or reduce it only minimally. <u>E.g.</u>, <u>American Nat. Bank & Trust Co. v. Regional Transp. Authority</u>, 125 F.3d 420, 438-39 (7th Cir. 1997) ("Although the award by the jury is quite

generous to WH, we do not believe that, given our deferential standard of review, the district court abused its discretion in denying the RTA's motion for a remittitur or a new trial").

Finally, when considering this third BMW factor, the court may look to the amount of punitive damages award necessary to deter similar misconduct in the future. BMW, 517 U.S. at 584-85; McHugh v. Olympia Entertainment, Inc., 37 Fed. Appx. 730, 738-40, 2002 WL 1065948 (6th Cir. May 28, 2002) ("Given the evidence of the intentional assault upon plaintiff, the punitive damages [$1.2 million] were not an inappropriately large deterrent amount"). As the Illinois Appellate Court[3] recently summarized in affirming a very substantial punitive damage award:

> The $6 million [punitive damage] award serves many important purposes. The size of the monetary award might finally deter Herman from driving while intoxicated where our criminal courts have failed. Furthermore, the award should serve to deter other individuals from risking the lives of innocents by driving while intoxicated. Finally, the award adequately punishes this particular defendant for his actions leading up to and including this accident. Herman admitted that he knew he was intoxicated after consuming eight or nine beers in a relatively short amount of time. . . . Given the outrageousness of Herman's behavior, the fact that the award clearly serves the punishment and deterrence purposes of a punitive damages award, and the lack of proof that the award was the result of passion, partiality, or corruption, we conclude that the amount in question is not excessive.

Ford v. Herman, 316 Ill. App. 3d 726, 735-36, 737 N.E.2d 332, 339 (5 Dist. 2000).

If six million dollars was an acceptable punitive damage award for a drunk driver in Illinois in Herman, a fraction of that is certainly appropriate for an unprovoked beating of a handcuffed man by an officer of the law. See NC Illinois Trust Co. v. First Illini Bancorp, Inc., 752 N.E.2d 1167, 1179, 323 Ill. App. 3d 254, 267 (3

---

[3] Whether the damage award was adequately supported by the evidence is evaluated under the Illinois law. Jabat, Inc. v. Smith 201 F.3d 852, 857 (7th Cir. 2000), citing Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 438 (1996).

Dist. 2001) (punitive damages serve to "deter others from similar conduct"); Sabir v. Jowett, 214 F.Supp. 2d 226, 235-36 (D.Conn. 2002) ("The jury, however, may have partly intended to punish Lisee for violating Mr. Sabir's rights to deter others in law enforcement from similar conduct").

## C. DEFENDANTS' PROFESSED INABILITY TO PAY DOES NOT JUSTIFY DISTURBING THE JURY'S PUNITIVE DAMAGE AWARD

Defendants argue in their post-trial motion that the Court should consider their financial status in considering a reduction of the award. While it might sound harsh, Judge Posner has explained that: "[t]he reprehensibility of a person's conduct is not mitigated by his not being a rich person, and plaintiffs are never required to apologize for seeking damages that if awarded will precipitate the defendant into bankruptcy." Kemezy v. Peters, 79 F.3d 33, 35-37 (7th Cir. 1996); see also Stafford v. Puro, 63 F.3d 1436, 1444 (7th Cir. 1995) (awarding $250,000 punitive damages despite defendant's assertion that he had no assets). Moreover, because judgments in Illinois "are good for seven years and may be revived" for another twenty, the Court should not limit its analysis to whether paying the full amount today is feasible. See Ibaenez v. Velasco, 2002 WL 731778, *15 (N.D.Ill. Apr. 25, 2002) ("For that punishment to be meaningful, the court should sustain amounts of the punitive verdicts that are realistically collectible against the defendants over a reasonable period of time in the future" in case involving excessive force) (citing FRCP 69(a); 735 ILCS 5/12-108(a) & 5/13-218).[4]

---

[4]  As Judge Grady eloquently explained in Ibaenez:
  So the fact that the defendants may be financially unable to pay
  a large amount at the present time, if it be a fact, does not
  mean that their exposure should be limited to what they are
  currently able to pay.  Their ability to pay over a period of
  years is the relevant test, and there is no reason the defendants
  should be absolved from a long-term responsibility for punitive
                                              (continued...)

More importantly, the Defendants' failure to raise the issue of their finances at trial -- a conscious choice on their part -- is a factor which cuts strongly <u>against</u> reducing the award at this juncture. <u>Kemezy</u>, 79 F.3d at 34-37 (Since "information about net worth is in the possession of the person whose net wealth is in issue, the normal principles of pleading would put the burden of production on the defendant"); <u>Ford v. Herman</u>, 316 Ill. App. 3d 726, 733-34, 737 N.E.2d 332, 339 (5 Dist. 2000) ("If [Defendant] knew that he would have financial difficulties in paying a punitive damages award, then he should have so informed the jury"). Additionally, Plaintiff cannot be forced to rely on the newly-proffered, un-cross-examined representations contained in Defendants' untimely Affidavits. Despite Plaintiff's discovery requests (<u>see</u>, e.g., Exhibit A, ¶ 1), Defendants produced no documents relating to their net worth at any point during discovery, nor are any such exhibits listed in the Final Pretrial Order. Before the Court even considers a reduction on this basis, Plaintiff should thus be permitted to serve discovery requests and third party subpoenas to discover Defendants' assets and net worth.

**D. THE ADVERSE FINDING ON PLAINTIFF'S HATE CRIME CLAIM DOES NOT PRECLUDE PUNITIVE DAMAGES**

It is sometimes said that the strength of an advocate's position can be gauged by the persuasiveness of the weakest argument. Applying that standard to Defendants' argument about the Hate Crime finding (Obj. at 11), Defendants position does not fare well at all.

---

[4]   (...continued)
      damages in this case.
<u>Ibaenez</u>, 2002 WL 731778, at *15. Judge Grady added that this conclusion is particularly appropriate where, as here, the jury's compensatory award is totally indemnified by a third party. <u>Ibaenez v. Velasco</u>, 2002 WL 731778, *15 (N.D.Ill. Apr. 25, 2002) ("The second factor to consider is that the defendants will pay not one penny of the compensatory verdicts"); <u>Price v. Highland Community Bank</u>, 932 F.2d 601 (7th Cir. 1991) (amount "which consisted of [defendant's] year's salary" was well within bounds).

Defendants are correct insofar as Plaintiff could not have prevailed on his Hate Crime claim unless the jury found Defendants acted with a mental state comparable to that required for punitive damages. The jury's adverse finding on the Hate Crime claim, however, does not compel the converse conclusion that the requisite mental state was therefore lacking. On the contrary, there were any of several alternative Hate Crime elements which the jury might have found absent, such as that the Defendants "knew" or perceived plaintiff's sexual orientation to be homosexual, or that the battery was committed "because of" plaintiff's actual or perceived sexual orientation. See 720 ILCS § 5/12-7.1(a)-(c) (incorporated into the agreed jury instruction). The Hate Crime verdict thus does not, as Defendants suggest, mean punitive damages were unavailable.

**III.      THERE IS NO INDICATION WHATSOEVER OF IMPROPER PASSION OR PREJUDICE WHICH COULD JUSTIFY VACATING THIS AWARD**

Put simply, given their lack of objections and generally favorable rulings, there is nothing of any substance left for Defendants to contest. Faced with no other basis for appeal, Defendants presently contend that the Court erred in permitting Plaintiff to make certain previously unchallenged arguments which they now claim "inflamed" the jury. As discussed below, however, there was nothing improper about any of Plaintiff's arguments. Purely for the sake of argument, even if there were -- which there was not -- anything for Defendants to complain about, any objection they might have otherwise raised was waived by their total failure to bring these arguments to the Court's attention at trial so that the Court could have either foreclosed Plaintiff from making the arguments or, for example, issued a curative instruction.

Moreover, as discussed below, the waiver point (while dispositive for purposes of appeal) is really just an aside because

the only improper "inflaming" at this trial emanated from the

Defendants, not the Plaintiff. <u>Doe By G.S. v. Johnson</u>, 52 F.3d 1448,

1465 (7th Cir. 1995) (party bears "a heavy burden when she seeks a new

trial based on improper remarks during a closing argument and from our

review of the record, we are of the opinion that Doe has not even come

close to meeting her burden").

### A. DEFENDANTS HAVE WAIVED THE ARGUMENTS THEY OFFER IN SUPPORT OF THEIR "PREJUDICE/PASSION" POSITION

The fact is, Defendants did not make a single objection

during Plaintiff's entire closing argument. Defendants' strategy of

waiting for the verdict before raising belated complaints about the

nature of Plaintiff's arguments is unavailing, and Defendants cannot

·hope to make up for the lack of contemporaneous objections by

recasting their waived objections under the rubric of "passion or

prejudice". Any such argument was waived and thus barred. <u>See</u>

<u>Martini v. Federal Nat. Mortg. Ass'n</u>, 178 F.3d 1336, 1340 (D.C.Cir.

1999) (<i>"Although Fannie Mae also claims that the jury verdict should

be set aside because it improperly resulted from passion or prejudice,

Fannie Mae waived that claim by failing to object to allegedly

inflammatory statements by Martini's lawyer at trial"</i>); <u>Doe By G.S. v.</u>

<u>Johnson</u>, 52 F.3d 1448, 1465 (7th Cir. 1995) ("At trial, Doe's counsel

made no objections to the defendants' closing argument, yet now tries

to raise its impropriety on appeal. Any potentially improper

statements should have been called to the attention of the trial

.judge, in order that she might be given a timely opportunity to

correct any prejudice that might result from such remarks. The

plaintiffs' failure to do so, waives this issue on appeal."); <u>Deppe v.</u>

<u>Tripp</u>, 863 F.2d 1356, 1363-65 (7th Cir. 1988) (party's failure to

object to allegedly prejudicial closing argument supposedly appealing

to jury's "base instincts" barred the nonobjector's right to raise

those statements as a basis for reversal of a jury verdict);
Lentomyynti Oy v. Medivac, Inc., 997 F.2d 364, 374 (7th Cir. 1993)
("To the extent that the plaintiffs are truly claiming that defense
counsel's closing was improper. . . this argument is waived.  Deppe
requires a party to object to alleged errors either during closing
argument or before the case is submitted to the jury"); Cefalu v.
Village of Elk Grove, 1998 WL 325191, *4 (N.D.Ill. 1998) (rejecting
argument that improper closing "unfairly prejudiced the jury" because
there were no objections at trial); Holmes v. Elgin, Joliet & Eastern
Ry. Co., 18 F.3d 1393, 1397-98 (7th Cir. 1994) (refusing to disturb
jury verdict because "[a]lthough he believed that these [closing
argument] remarks were inflammatory and unsupported by evidence,
counsel for EJ & E did not object to the statements and chose instead
to respond in his own closing. . . Nor did he move for a mistrial.
Instead, EJ & E waited to raise the objection until after the jury had
delivered its verdict").[5]

---

[5]  As the Seventh Circuit explained in Holmes:
    EJ & E had several opportunities to object to the remarks it
    found inappropriate but it chose not to object until the
    jury returned an adverse verdict.  Risky gambling tactics
    such as this are usually binding on the gambler.  As a
    result, the objection is considered waived.  The law in this
    circuit is clear.  In civil cases, to preserve for appellate
    review errors which are alleged to have occurred during
    closing argument, a party must object to those errors before
    the trial judge submits the case to the jury to deliberate.
    This rule enables a trial judge to make any necessary
    curative instructions. . . [Thus], any claims of impropriety
    which EJ & E might have had based on Holmes's closing
    statement were squandered when EJ & E failed to object in a
    timely fashion.
Holmes v. Elgin, Joliet & Eastern Ry. Co., 18 F.3d 1393, 1397-98 (7th
Cir. 1994) (citations omitted).

**B.**   **THERE IS NO BASIS FOR FINDING THE JURY ACTED FROM IMPROPER PASSION OR PREJUDICE**

Even leaving aside this dispositive waiver issue, none of Defendants' "prejudice" arguments have the slightest merit in any case. They are discussed in the order they are presented.

### 1.   THE ARREST PHOTO

Defendants argue first that Plaintiff created unfair prejudice and passion by raising the possibility that the digital image may not have been what Defendants were claiming it was. This argument is a nonstarter.

*After discovery closed,* Defendants served Plaintiff with a Rule 26 Report from a physician who stated he had reviewed two color photographs and determined Plaintiff had not been hit. What color photographs? All of Plaintiffs' witnesses in this case had been asked at their depositions to describe Plaintiff's face without any knowledge that Defendants were holding back these color photographs.

When this discovery violation was brought to the Court's attention, the Court denied Plaintiff's requested relief and instead ordered Defendants to provide Plaintiff copies of the photographs. In response to this Order, Defendants sent Plaintiff a piece of paper containing two color photographs.  See Exhibit B.  Plaintiff used this paper to seek expert rebuttal testimony and to prepare for trial.[6]

During Defendants' opening statement, however, it was revealed to Plaintiff for the first time that the piece of paper Defendants had provided was not the photograph after all; Ms. Brown stated in the jury's presence that what Plaintiff was relying upon apparently was nothing but a "photocopy" of the actual photograph. Defendants, on the other hand, showed the jury a significantly higher-

_____

[6]  Before trial, Plaintiff unsuccessfully renewed his motion to bar references to the photographs given these egregious discovery abuses.

resolution digital image they had downloaded to their laptop. The first Plaintiff learned that there was a high-resolution digital image was literally as Ms. Brown was showing it to the jury.

Seriously concerned to learn that Defendants had withheld the existence of this digital file, Plaintiff, among other things, moved to bar it as lacking in foundation. No witness _ever_ gave the slightest clue -- either in discovery or at trial -- as to where this digital image came from, much less whether it was presently in the same form it was in when it was originally created, or whether it had been digitally manipulated given that it certainly appeared to show less redness than the photocopy supplied to Plaintiff.

Plaintiff's foundation objection was overruled, although the Court did agree to Plaintiff's request that Defendants were to provide Plaintiff a copy of the disk so at least the field would be even. The Court denied Plaintiff's request for an immediate production, but did order Defendants to do what they could to get it to Plaintiff. When several trial days passed without production, Plaintiff again brought the issue to the Court's attention and again asked for immediate pro-duction. Defendants' counsel, Mr. Monahan, stated to the Court that the soonest he could have the disk copied would be Monday, immediately before closing arguments. Over Plaintiff's objection that this would be far too late (after all of the witnesses were completed and not allowing Plaintiff time to experiment with the color settings), the Court ruled that a Monday production would be sufficient.

Disturbingly, when closing argument did not proceed on Monday due to unforeseen circumstances, Defendants _still_ did not provide Plaintiff the disk. Plaintiff's counsel faxed a letter to Defendants' counsel Monday morning asking for the disk, but Defendants never even responded. See Exhibit C. Nor did they ever respond to a similar letter later that afternoon asking to send a messenger to pick

up the disk.  _Id._  Defendants ignored a similar letter on Tuesday.
_Id._  When all of this was brought to the Court's attention on
Wednesday, the Court accepted Mr. Monahan's explanation that there had
been an unspecified "snafu" and denied Plaintiff's renewed motion to
bar Defendants from relying on the digital image.[7]

The task of copying a computer file containing a photograph
from one disk to another takes a matter of minutes.  _See_ Exhibit D.
To this day, however, Defendants have never respected the Court's
order to provide a copy of the disk to Plaintiff, making it impossible
to attach the file to this Brief to make it part of the record.

To make matters even worse, Plaintiff asked Defendants'
counsel if they could at least access Defendants' laptop while
awaiting production of the disk so they could (a) see for themselves
whether the "blue" setting had been maximized at the expense of the
"red" setting; and (b) make a strategic determination as to whether
they could use the digital image during their own examinations.  The
Defendants refused.  Plaintiff moved the Court for assistance at
breaks during the trial, and the Court ordered Defendants to allow
Plaintiff to access the laptop.  In a pattern that was repeated
throughout this litigation, however, as soon as the Court left the
room, the Defendants continued to refuse Plaintiff's requests.
Plaintiff brought the matter to the Court's attention at least one
more time (putting on the record Defendants' refusal), but at no point
during the entire trial did Defendants _ever_ permit access to their
laptop.  _See_ Exhibit C.  Nor did they ever even bother to respond to

---

[7]  Moreover, it turned out that Defendants' expert witness claimed to
have relied on the higher-resolution digital image whereas Plaintiff's
expert (necessarily) based her opinion on the photocopy Defendants had
provided.  Before closing argument, Plaintiff pointed out to the Court
the fundamental unfairness of this discrepancy in terms of jury
perception, but Plaintiff's request for relief was again denied.

Plaintiff's letters on Monday and Tuesday (during the unforeseen break in the trial) requesting to come to Defendants' office at their convenience to access their laptop.[8]

Plaintiff was thus forced to try to pursue his case without any access to what the Defendants were claiming was the only reliable evidence of Plaintiff's face. As the Court pointed out, Plaintiff was able to put the coarse photocopy on the ELMO machine and blow it up on the big screen for the jury. What Plaintiff could not do, however, was show the jury any version of the Defendants' resolution-enhanced digital image (which appeared to show absence of any trauma) in order to illustrate that the color settings do matter. Thus, throughout the trial, Defendants continued to show the jury an unduly blue and insufficiently red digital image -- leaving it up on the screen as a backdrop, for example, during Mr. Waits' entire cross-examination. Plaintiff was never able to counter with an undistorted version of the high-resolution image.

On the record and outside the presence of the jury, Plaintiff attempted to make an offer of proof consisting of the courtroom technology assistant's testimony that there was no "baseline" for the ELMO's blue versus red color setting. In other words, the digital image could be as blue or as red as the screen operator preferred. Plaintiff's attempt to make this offer of proof was denied by the Court.

---

[8] Also refused were Plaintiff's requests on the record during cross-examination to have Defendants' counsel themselves return their own screen to the "desktop" (a single click of the mouse) to illustrate for the jury that Defendants' chosen baseline setting was unduly blue and insufficiently red. Plaintiff was thus not only denied the disk itself and access to the only laptop with the image, but he was also denied the ability to request that Defendants allow use of their laptop before the jury.

Given all of this, Plaintiff's closing argument did point out to the jury that the digital image relied upon the Defendants (which appeared to show no trauma) was unduly blue when contrasted to the photocopy, which showed far more redness. Plaintiff also pointed out that applying common sense, a digital image is subject to digital manipulation. Such argument was consistent with the Court's instruction to use common sense, and was nothing but fair advocacy. Indeed, having failed to provide a shred of evidence supporting a foundation for where the digital image came from, Defendants are hardly in a position to condemn Plaintiff for speculating about the possibility that it may well not be what it purports to be. And having denied Plaintiff the actual ability to show that the digital image might have looked different on a different color setting, Defendants are likewise off track in contending that Plaintiff could not at least point out this possibility during argument. The lack of any objection during that argument is the final nail in the coffin.

### 2. DEFENDANTS' SUBPOENAS

Defendants' FPTO Exhibit List included Plaintiff's subpoenaed phone records, work records, and therapy records; accordingly, Plaintiff was certainly entitled to address this evidence at trial. Also, when Defendants argued to the jury that it was this litigation which was creating Plaintiff's stress, not the alleged beating, Plaintiff merely countered that to the extent this litigation was in fact causing him stress, it was because of the manner in which the case was being defended: His private phone records were being made part of the public record, for example, and his employer received not just one, but two subpoenas spaced several months apart under the caption <u>Waits v. Chicago</u>. There was nothing even remotely improper about Plaintiff's argument here, which is why Defendants never raised any objections during the trial.

### 3. PLAINTIFF'S SUPPOSED "PSYCHIATRIC DISORDERS"

Defendants argue next that the Court erred in permitting Plaintiff to argue that the Defendants' response to the accusation of police abuse in this trial was to "smear" Plaintiff by referring repeatedly to his supposed "psychiatric disorders." There was no objection any kind along these lines at trial, and had there been, it would have had no merit whatsoever.

Plaintiff filed a motion to quash the Defendants' Rule 35 mental health examination before trial, and he subsequently moved *in limine* to bar Defendants from parading "diagnoses" before the jury. As Dr. Yohanna's subsequent Report revealed, Defendants' sole intention was to attempt to "bootstrap" into the trial certain facts which they deemed embarrassing to Plaintiff. See Exhibit E.

Plaintiff believes his record is fully preserved that this was not proper under the relevant caselaw. Plaintiff also believes he made an adequate record that references to his phone records (a subpoena which Plaintiff also timely moved to quash) should have been barred, as should have been references to several categories of old therapy records and work records which Defendants also subpoenaed.

While the Court denied Plaintiff's objections to these Exhibits on the Final Pretrial Order ("FPTO") and Plaintiff's motions *in limine* on the subject, the Court presumably did not contemplate what the Defendants proceeded to do at trial. In a case without any eye witnesses where credibility was everything, Defendants constantly referred to Plaintiff's "psychiatric disorders," attempting to imply that Plaintiff was a person who should not be believed. For instance, after Krista Knigge testified for fifteen minutes about the pain her friend had suffered, Mr. Monahan conducted a one-question cross-examination, asking Ms. Knigge whether she knew Plaintiff suffers from "four separate psychiatric diagnoses."

The most serious example, however, was Defendants'
preoccupation with Plaintiff's supposed "fragmentation of reality."
Without any legitimate foundation whatsoever, Mr. Monahan repeatedly
asked Mr. Waits and other witnesses about a "fragmentation of reality"
problem. Mr. Monahan went so far as to waive around a thick
transcript during the cross of Dr. Feldman, stating on the record that
he had numerous references supporting that "fragmentation" diagnosis.

As each of the witnesses who testified at trial
corroborated, however, Plaintiff does not suffer from "fragmentation
of reality." Most troublingly, by the time the Defendants closed
their case, they had not even <u>attempted</u> to support a proposition that
Plaintiff had the slightest problem with reality, meaning all of their
questions in that regard were out of bounds from the inception.
Defendants' attempt to smear Plaintiff in that regard without even
attempting to call a witness to prove up their scurrilous allegations
is certainly fair game for closing argument. It is Plaintiff, not
Defendants, who has cause for complaint.

### 4.    MOTION *IN LIMINE*

Defendants argue next that Plaintiff created unfair
prejudice and passion by referring to his sentence for the water
squirting battery. First, Defendants made no objection whatsoever on
this point at trial and it will thus not be considered by the
appellate court. Turning to the merits, however, it is plain that the
reason Defendants did not object at the time was because there was no
basis for objection.

In particular, Defendants have mischaracterized the motion
*in limine* which Plaintiff sought and the Court granted. <u>See</u> Pltf.
Third Mot. *in Lim.* The Motion was narrowly tailored to bar only
references to the prejudicial fact that Plaintiff's sentence included

an order to continue therapy; the motion did not seek to bar any references to the sentence itself. See id. at 6-7.

Moreover, to the extent there was any attempt to generate unfair prejudice and passion on this point, the effort was by the Defendants themselves. Plaintiff had moved *in limine* to bar references to his prior bad act of squirting the police officer beyond the fact that it happened. See Id. After persuading the Court to deny that motion, Defendants' entire trial strategy was devoted to focusing the jury's attention on the events which had occurred the day before the alleged civil rights violations: the convenience store water bottle purchase, Plaintiff's decision to fight traffic to return to the scene just to squirt the officer, disputed accounts of the squirting itself, Plaintiff's emotions and motivation in squirting the officer, his reaction to the squirting, etc.

All of this, Plaintiff had argued *in limine* and at trial, was an irrelevant distraction from the real issues for this civil rights trial, namely, whether the Defendants used excessive force the following day. Plaintiff's *in limine* objections were realized when Defendants proceeded to use this "prior bad act" evidence in exactly the way it is not supposed to be used, i.e., to create the impression that Plaintiff was a bad or crazy person, or that he "had it coming." If there was in fact a relevant purpose to allowing such an in-depth sideshow, Plaintiff cannot fathom what it was. Thus, given Defendants' wholly inappropriate strategy, it is difficult to believe they are the ones complaining on this point.

### 5. OVERNIGHT DETENTION

The only one of these points to which Defendants did preserve any objection was the 22-hour issue. There was no error, however, in any of the Court's rulings on this point.

The Court stated on the record that it was allowing evidence and argument on this point because by the time Defendants did object, it was far too late in the trial, as there was already too much testimony on the point. More importantly, however, there was nothing wrong whatsoever about the presence of this issue in the case because it was relevant for at least four independently admissible purposes.

First, the overnight nature of Plaintiff's confinement (roughly five times longer than other misdemeanants) is relevant to rebut Defendants' contention that this was a "normal" situation treated just like any other arrest where the person is released after booking simply by signing an I-bond. Second, Durst threatened Plaintiff that he was going to meet sexual violence in his cell; for damage purposes, Plaintiff was thus entitled to show that he spent 20+ hours waiting to see if Durst's threat was going to materialize. Third, Defendants argued that Plaintiff had no picture showing redness to his face. To meet this argument, Plaintiff had to be permitted to show that he was detained under usual circumstances without access to his own camera for a period long enough for any swelling and redness to have minimized.

Finally, and perhaps most importantly, Durst and Prusank base their entire argument on their premise that after Durst dropped Plaintiff with the booking officer Ortiz,[9] they had no further contact with Plaintiff's detention. In other words, Defendants insisted, despite Prusank's status as a supervisor, that they never knew Plaintiff was being held unreasonably long. This testimony was destroyed, however, by Officer Kostecki, who admitted on the stand

---

[9] Ortiz's testimony did Defendants no favors because he distinctly remembered this booking -- down to the tone of Plaintiff's skin -- among his many other bookings even though he never knew it was the subject of a lawsuit until more than a year after the fact.

that when he got to the station the following day, Prusank *told him that Plaintiff was still in the lock-up.* Prusank was thus lying when he testified that he had no idea Plaintiff was being held overnight.

For each of these four reasons, there was thus no error in permitting this evidence, much less unfair "prejudice" which could justify reducing or vacating the punitive damage award.

### 6. UNSUSTAINED OPS COMPLAINT

Finally, Defendants argue -- again without having raised any contemporaneous objections, see <u>Doe By G.S. v. Johnson</u>, 52 F.3d 1448, 1465 (7th Cir. 1995) ("neither trial tactics nor mere temerity will excuse counsel's failure to object to a remark made in closing argument") -- that Plaintiff's argument about the unsustained C.R. complaint was improper. Defendants are incorrect.

The primary strategy of the defense was to call into question Plaintiff's motivation in bringing this lawsuit, arguing that he waited eight months to bring the suit. Defendants further urged the jury to believe that Plaintiff was interested only in publicity or money. Plaintiff responded by pointing out that he did not in fact rush to the courthouse. On the contrary, he waited patiently for a determination by the Defendants' employers regarding his complaints of abuse. Having failed to receive that measure of justice, Plaintiff turned to the legal system. There was nothing improper here.[10]

### IV. THE JURY'S $15,000 COMPENSATORY DAMAGE AWARD WAS NOT EVEN ARGUABLY THE PRODUCT OF IMPROPER PASSION OR PREJUDICE

Regardless of the resolution of the punitive damage award issue, Defendants cannot -- and do not -- seriously contend that

---

[10] Moreover, Defendants listed the OPS investigator on their FPTO Witness List, and multiple C.R. documents were on their Exhibit List. Plaintiff was entitled to address this evidence with his own take on it, which is all that he did.

28

$15,000 in compensatory damages is not supported by the evidence. Defendants' half-hearted argument in that regard must be rejected.

Specifically, there is no rule of law that compensatory damages are unavailable for physical injuries unless there is hospitalization or medical corroboration. E.g., Mendoza v. City of Rome, 872 F. Supp. 1110 (N.D.N.Y 1994) ($62,500 compensatory award where plaintiff was slammed against police car and pushed into the back seat of the vehicle causing mental anguish but only limited personal injuries).[11]

Moreover, even leaving aside the physical beating, there was certainly enough testimony about Plaintiff's emotional distress to support a $15,000 verdict. Plaintiff, two of his friends, his therapist, and an expert all testified without contradiction that Plaintiff was affected very seriously by the beating.[12] Sulkowska v. City of New York, 129 F.Supp. 2d 274, 308-09 (S.D.N.Y. 2001) (Section 1983 plaintiff who was humiliated during a false arrest and subsequent detention and suffered from post-traumatic distress with accompanying symptoms of depression, fear and disturbed sleep was entitled to $275,000 for her emotional injuries, including past and future pain and suffering). Compare Nekolny v. Painter, 653 F.2d 1164 (7th Cir. 1981) (cited by Defendants) (Plaintiff presented no witness or evidence whatsoever that retaliation caused any distress).

---

[11] Defendants mis-cite McNair v. Coffey, 279 F.3d 463 (7th Cir. 2002) for the proposition that "lack of objective evidence to establish injury defeats a claim the defendants used excessive force." See Def. Obj. at 13. In fact, the McNair plaintiffs did not even allege excessive force, but rather only that they were "frightened" by the number of police who participated in their otherwise valid arrest. Id. at 465-68.

[12] Defendants never did call their expert witness, but he too would have conceded that Plaintiff was accurately reporting genuine distress. See Exhibit E, Dr. Yohanna's Report.

Defendants last-ditch argument that Plaintiff cannot recover because he previously experienced depression in his life has no merit. Plaintiff and his witnesses all testified without contradiction that the unprovoked beating merely exacerbated what his therapist described as a pre-existing vulnerability. Schroeder v. Hamilton School Dist., 282 F.3d 946 (7th Cir. 2002) ("It has long been the rule in tort law, the 'thin-skull' or 'eggshell-skull' rule, not only that the tortfeasor takes his victim as he finds him, but also that psychological vulnerability is on the same footing with physical").

In sum, Defendants make no contention that the jury's $15,000 compensatory damage award was the product of undue passion or prejudice, nor do they seriously contend that there is insufficient evidence to support it. As such, the jury's determination must stand. Nydam v. Lennerton, 948 F.2d 808, 811 (1st Cir. 1991) ("Translating legal damages into money damages -- especially in cases which involve few significant items of measurable economic loss -- is a matter peculiarly within a jury's ken").

**V.      SHOULD THE COURT DECIDE TO DISTURB ANY OF THE DAMAGE AWARDS, THE COURT MUST OFFER PLAINTIFF THE CHOICE OF A NEW TRIAL LIMITED TO THE ISSUE OF DAMAGES**

Relying on a case from 1893 about cattle abuse, Defendants invite error by suggesting in footnote 1 of their Objection that this Court should enter judgement for the "proper amount, if any" of a reduced damage award without offering Plaintiff the choice of a new trial on damages. The law is well-established in this Circuit, as elsewhere, that the Court may not disturb a jury's verdict without first offering Plaintiff an opportunity for a new trial limited to damages. See McNabola v. Chicago Transit Auth., 10 F.3d 501, 516 (7th Cir. 1993) (cited by Defendants) (where party argued the verdict was excessive, "the court appropriately provided McNabola the option either of accepting the remittitur or receiving a new trial on

damages"); <u>Haluschak v. Dodge City of Wauwatosa, Inc.</u>, 909 F.2d 254, 256 (7th Cir. 1990) (where a jury verdict "meets this severe ['monstrously excessive'] standard," trial court still must present the plaintiff with the option of a reduction of damages or a new trial on damages).

### Conclusion

Before trial, Defendants had referred to this case derisively as the "slap" case. They can do so no more. The jury accepted Plaintiff's version that he was subjected to a completely unprovoked (and cowardly) beating while his hands were shackled behind him, a beating consisting of fifteen or more very hard blows which caused him pain and months of well-documented emotional distress. The fact that this beating did not physically bruise or disfigure Plaintiff simply does not negate all basis for a significant punitive damage award.

Had this Court been the factfinder, it may well have awarded less punitive damages. But that is not the standard of review. Where, as here, a jury has spoken (after more than a week of trial and two days of deliberation) the jury's determination can be disturbed only under the most unusual circumstances. And to the extent there is any room for a remittitur, the maximum recovery rule precludes reduction to anything less than $75,000 per Defendant.

In sum, this was a hard-fought case from the beginning, and in the end, Plaintiff successfully prevailed at a jury trial on the merits. Defendants' present attempt to have the Court substitute its own judgment for that of the jury is unavailing.

31

RESPECTFULLY SUBMITTED,

_____
Attorney for Plaintiff

Arthur Loevy
Jon Loevy
Michael Kanovitz
Danielle Loevy
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900

SEE CASE
FILE FOR
EXHIBITS